IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MITCHELL P. POWELL,

        Plaintiff,

  vs.

UNITED STATES OF AMERICA,

        Defendant.

Civil No. 05-6193-AA
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

---

Daniel c. Dziuba
Tichenor & Dziuba LLP
1100 S.W. Sixth Avenue, Suite 1450
Portland, Oregon 97204
    Attorney for plaintiff

Peter Keisler
Assistant Attorney General
Karin Immergut
United States Attorney
James Sutherland
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

Page 1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

R. Michael Underhill, Attorney in Charge
Mimi Moon, Trial Attorney
U.S. Department of Justice
PO Box 36028, 450 Golden Gate Ave, Rm 7-5395
San Fransico, California 94102-3463
    Attorneys for defendant

AIKEN, Judge:

    This case was tried to the court without a jury on July 10-11, 2007. The Court heard and reviewed the testimony of the witnesses, live and by deposition, and considered the evidence of record, the credibility of the witnesses, the entire file of the Court, and the contentions and arguments of counsel. Therefore, in accord with Fed. R. Civ. P. 52(a), the Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. Plaintiff Powell filed this action against the United States for injuries sustained aboard his sailboat, the S/V SWAY, on July 20, 2003. The incident occurred in rough seas approximately 20 miles northwest of Brookings, Oregon, when plaintiff's vessel became disabled due to engine failure and he contacted the U.S. Coast Guard. The Coast Guard dispatched a 47-foot motorized lifeboat ("MLB") to assist the SWAY. This constituted a rescue response.

2. First Class Petty Officer, Greg Babst, a Coast Guard coxswain, was in charge of the five-man crew on the MLB.

3. The coxswain is in charge of, among other things, driving the Coast Guard vessel, the safety of his boat, and his crew.

4. The MLB took about two hours to reach the SWAY.

5. When MLB arrived at the SWAY, seas were six to ten feet, the wind was 20 knots, and although it was still daylight, visibility was limited to approximately 100 yards due to fog.

6. As the MLB's crew approached the SWAY, the SWAY's mast was tipping from one side of the vessel to the other, nearly hitting the water on each side as the vessel went over each wave.

7. The MLB circled the vessel, steering clear of the SWAY's mast, as Babst established communications with plaintiff.

8. Babst asked plaintiff if he was having any other problems with the vessel (ie, secure deck fittings). Plaintiff responded "no."

9. Babst asked plaintiff if he had any "medical conditions." Plaintiff responded "that he was fine."

10. Babst asked plaintiff if he had ever been towed before. Plaintiff responded "yes."

11. Babst then performed a risk assessment and discussed the various options to effect the rescue. Because it was not an emergency tow, Babst decided against calling out a second vessel. Babst testified that a helicopter was not an option due to the dense fog.

12. Babst decided against a crew transfer from the MLB to SWAY. The rough, choppy waves prevented a crew transfer since the danger of collision during a close aboard transfer in such

Page 3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

conditions would have created the possibility of having two disabled vessels (the Coast Guard MLB and plaintiff's boat) more than 20 miles from the nearest assistance.

13. The transfer itself would also potentially injure or even cause death to any Coast Guard crew member who, during transfer, fell into the water and became sandwiched/crushed between the two vessels.

14. Babst testified that "safety drove all decisions." He declined to consider removing plaintiff from his vessel because he believed that course of action to be unsafe. In fact, despite Babst's knowledge of his crew's fitness, experience and expertise, he also declined to transfer one of his crew over to plaintiff's vessel for similar safety reasons.

15. Babst testified that it would have been unsafe to ask plaintiff to board his life raft and attempt to paddle over to the MLB. Babst stated that the most dangerous course of action was "putting someone in the water," particularly when there was no reason to do that given that plaintiff was aboard a "stable platform" that was not sinking.

16. Upon the coxswain's orders, after directing plaintiff to go to the stern of the vessel to retrieve a passing line with a sea drogue attached to it, one of the MLB deckhands threw plaintiff a drogue to stabilize SWAY during the tow and explained to plaintiff the functions of a drogue.

17. Plaintiff testified that he was aware of the use and functions of a drogue.

18. A drogue is something like a parachute. It is made of similar material and performs virtually the same function in the water - slowing a person's or vessel's movement.

19.  The drogue weighs approximately 25 pounds. It was four feet in length, three feet in width at the top, 21 inches in width at the bottom and the total circumference was six feet at the top. There was 200 feet of double braided nylon rope attached with a swivel shackle and thimble spliced into the eye of the line.  At the end of the line was an eye splice.

20. When towed in rough seas and waves, such as was experienced during the incident, the drogue, among other things, prevents the towed vessel from "surfing" down wave faces and potentially corkscrewing and/or capsizing, which could injure or kill the person aboard the towed vessel, as well as putting the towing vessel and its crew at risk.

21. The Coast Guard noticed that plaintiff was having difficulty setting up the drogue on deck.  Babst noted that the drogue line was wrapped over the handrail and was a hazard.  The Coast Guard instructed plaintiff to readjust the drogue line which he did.

22.  Babst then directed plaintiff to go to the bow of the SWAY to receive the towing bridle.  As plaintiff was moving to the bow, the Coast Guard noticed that plaintiff was very unstable and

Page 5 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

had to crawl to the bow of the SWAY and then crawl back to the stern. Babst noted that plaintiff did not have his "sea legs."

23. While at the bow of the SWAY, plaintiff had a difficult time pulling in the bridle and hooking up the tow. The Coast Guard agreed that plaintiff seemed disoriented and fatigued.

24. Babst advised plaintiff to "fake out" the line - i.e., to lay down the line in an elongated, overlapping "S" pattern - so that when the drogue was thrown overboard at the proper time, the line would pay out and not become caught on the vessel (or plaintiff) or tangled up.

25. As best could be seen from the distance that was needed to maintain safe separation of the two vessels, i.e., for the safety of both vessels and their crew, plaintiff appeared to comply with the instructions.

26. Plaintiff was instructed to wait to deploy the drogue until he was expressly directed to do so by Babst, as well as to keep his hands and legs clear of the line.

27. After securing the tow line, plaintiff got back on his radio, which was located on the lower deck in the cabin of the vessel. Plaintiff informed Babst that the tow equipment was in place.

28. To commence the tow, Babst had to take the slack out of the 700 foot tow line, which was accomplished by putting the MLB in gear and moving it away from the SWAY until the line became taut.

29. Once the towline was played out and became taut, Babst

Page 6 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

radioed plaintiff that he was to begin deploying the drogue. Plaintiff responded by radio that he had already commenced putting out the drogue. Babst turned to his crew and asked them to verify that plaintiff reported he was already deploying the drogue. The crew verified plaintiff's statement.

30. Babst testified that he felt frustrated that plaintiff had decided to begin deploying the drogue line before Babst had indicated he was to begin. Babst testified that he always gave a number of safety instructions prior to signaling to a vessel master to begin deploying a drogue line.

31. Shortly after this radio communication, plaintiff's left leg was ensnared by a loop of drogue line. Plaintiff was pinned to the stern rail. Plaintiff laid down to lessen the chance that he would be pulled overboard. Plaintiff screamed, attempting to attract the attention of the Coast Guard crew. Plaintiff hooked an empty fuel can to his boat pole, placed it over the side, extended it out from the vessel and waved it up and down for several minutes trying to attract the attention of the Coast Guard crew. The fuel can fell into the water, and plaintiff did the same thing with another empty fuel can, which also fell into the water. Plaintiff then removed his inflatable harness and inflated it. He tied the inflatable harness to the end of the boat pole, placed that out over the side of the boat and waved it up and down in an attempt to attract the attention of the Coast

Page 7 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Guard crew. When the inflatable harness came loose from the boat pole, plaintiff took off his yellow slicker, tied the hood to the boat pole and waved it over the side of the SWAY hoping to attract the attention of the Coast Guard crew but without success.

32. Meanwhile, Babst made several attempts to contact plaintiff via radio, but received no response. Because plaintiff's leg was caught in the drogue line pinning him to the stern rail on the deck he was not able to reach the radio to communicate since the radio was located below deck in the cabin hatch.

33. Babst initially thought his radio might be malfunctioning due to the amount of spray it received, so he asked the Coast Guard station (Station Chetco River) to radio plaintiff. The Coast Guard station also attempted radio communication with plaintiff without success.

34. Suspecting that plaintiff might have fallen overboard, Babst circled back to look for plaintiff, careful to avoid the tow line which, if caught in the propeller or rudder of the MLB or the rudder of the SWAY, would disable the MLB. A crew member on the MLB reported that he thought he saw plaintiff on the deck of the SWAY. Babst, after turning back a second time, created enough slack for plaintiff to free himself.

35. Plaintiff's leg was caught in the drogue line for approximately 30 minutes. As a result of the injury, plaintiff

Page 8 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

suffered a strangulation injury of his left leg and compartment syndrome requiring several surgical procedures.

36. Plaintiff made it to the radio and radioed the Coast Guard that he was weak and going into diabetic shock, which was the first time he told the Coast Guard that he had diabetes.

37. With drogue lines behind the SWAY and tow lines between the two vessels, and due to the sea conditions described above, the MLB could not get near enough to the SWAY to safely attempt a crew transfer.

38. Since safe harbor was two towing hours away, and due to plaintiff's injury, Babst reclassified the tow as an emergency tow, and called for additional assistance.  Babst simultaneously proceeded to tow the SWAY.

39. Roughly halfway to the harbor, a second MLB, a Coast Guard helicopter, and a 23-foot utility boat with foam sides met the MLB and SWAY in order to attempt to provide assistance.

40. Due to the continuing sea and weather conditions (i.e., the same conditions that previously prevented Babst from permitting a crew transfer), neither the second MLB nor the helicopter could put a crew member onboard SWAY.

41. Only the foam sides of the utility boat allowed it to come alongside SWAY and permit the transfer of two medical personnel onto the SWAY.

42. Powell disregarded the inherent dangers of sailing, the

difficulties of sailing alone especially when one is a novice sailor, the observed weather and sea in the Northwest waters he was sailing (and predictable weather via regular marine weather forecasts and broadcasts), and his own medical condition.

43. In judging and weighing the credibility of the witnesses, including the documents and exhibits that were admitted, the Court credits as true the Coast Guard's version of the incident, specifically the rescue operation (both the non-emergency tow and the emergency tow), plaintiff's actions, and the actions of the MLB crew.

44. The Coast Guard reasonably followed rescue guidelines and made conscientious efforts to ensure the safety of the MLB, the crew, plaintiff, and his vessel.

45. In all relevant respects, I find no evidence that the MLB or its crew, including Babst, violated any mandatory guidelines regarding how a coxswain under the existing circumstances must handle a towing operation. Further, I find that Babst's actions and decisions were reasonable, within the towing guidelines, and subject to his discretion.

46. In all relevant respects, the MLB and its crew's actions were based on policy considerations, particularly upon considerations of safety of life for all concerned, including the safety of the crew members of the MLB.

47. Babst and the crew members exhibited reasonable care with

Page 10 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

respect to the incident, including the tow of SWAY.

48. Plaintiff prematurely deployed the drogue and caused the injury through his own actions in deploying the drogue.

49. The accident occurred solely as a result of plaintiff's actions and negligence and did not result from any fault or negligence of the Coast Guard.

50. Plaintiff fails to sustain his burden of proving liability and fault on the part of the defendant United States.

51. Because plaintiff has failed to carry his burden of proof regarding liability and damages, judgment is entered for the United States.

**CONCLUSIONS OF LAW**

1. This case against the United States arose on navigable waters of the United States and asserts personal injury claims as a result of alleged negligence by the crew of a United States Coast Guard vessel. Accordingly, this is an admiralty and maritime matter within the meaning of Fed. R. Civ. P. 9(h) and jurisdiction against the United States exists pursuant to the Public Vessels Act (PVA), recodified at 46 U.S.C. § 31101, et seq. (previously §§ 781-790), which incorporates the consistent provisions of the Suits in Admiralty Act (SIAA), recodified at 46 U.S.C. § 30901, et seq.(previously §§ 741-752).

2. The PVA provides a limited waiver of immunity by the United States for certain maritime claims. Under these statutes, the

Page 11 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States has waived its sovereign immunity in cases where an action in admiralty could be maintained against a private party. Accordingly, liability may be found against the United States if a private person would be liable under similar circumstances. <u>Canadian Aviator v. United States</u>, 324 U.S. 215 (1945). Under the statute an injured party has no greater claim against the sovereign than he would have against a private person. <u>Id.</u>

3. I find that the discretionary function exception, as alleged by the defendant, does not apply to the facts at bar. <u>Lesoeur v. United States</u>, 21 F.3d 965, 968 (9th Cir. 1994)(courts lack subject matter jurisdiction over tort actions based upon the performance by the sovereign of discretionary functions, including cases alleging admiralty and maritime causes of action)(internal citations omitted).

4. Based upon the Court's Findings of Fact, as applied to the legal standards set forth herein, the Court concludes as a matter of law, that the United States was not negligent in any regard, and that its actions and decisions were reasonable and within the reasonable standard of care. Moreover, the court finds that none of the Coast Guard's actions caused or contributed to the incident and/or injury sustained by plaintiff.

5. Moreover, since the court has determined that plaintiff has failed to carry his burden of proving liability in the first instance, apportionment for comparative fault is unnecessary.

6. Any Findings of Fact which constitute Conclusions of Law and Conclusions of Law which constitute Findings of Fact shall be deemed to have been determined accordingly.

IT IS SO ORDERED.

Dated this 6 day of August 2007.

                                                    /s/ Ann Aiken
                                                    Ann Aiken
                                        United States District Judge